## WILLIAMS *v.* CIVIL SERVICE COMMISSION OF THE CITY OF DETROIT

1. CONSTITUTIONAL LAW—DECISION OF CONSTITUTIONAL QUESTIONS.

   Courts will not generally reach a constitutional question if they can decide the case on nonconstitutional grounds, whether such grounds have been properly raised by the parties or not.

2. MUNICIPAL CORPORATIONS—CIVIL SERVICE COMMISSION—POWERS—CONDITIONS OF EMPLOYMENT — RESIDENCE REQUIREMENT — DISCHARGE OF EMPLOYEES.

   Detroit Civil Service Commission is without power to promulgate or enforce rule mandating discharge of a municipal employee for nonresidence.

3. SAME — CIVIL SERVICE — DISCHARGE OF EMPLOYEE — POWERS OF COMMISSION—CITY CHARTER.

   The charter of the City of Detroit does not give the Detroit Civil Service Commission the power to establish any continuing condition of employment, and gives to the appointing authority, not to the commission, the power when, if at all, to discharge an employee; thus the commission may not require discharge of an employee for violation of the commission's rule requiring employees to live in Detroit (Detroit Charter, Title 4, ch. 2; civil service commission rule VII).

4. SAME — CIVIL SERVICE COMMISSION — POWERS OF COMMISSION — CITY CHARTER.

   The authority of the Detroit Civil Service Commission to take such action as shall be "necessary" to carry out the provisions of the city charter concerning civil service and to adopt pertinent rules does not authorize a rule establishing a general

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law § 111.
[2–4] 15 Am Jur 2d Civil Service § 8 *et seq.*

residence requirement as a continuing condition of employment; a rule of the civil service commission in conflict with requirements of the charter is invalid (Detroit Charter, Title 4, ch. 2; civil service commission rule VII).

Appeal from Wayne, Baum (Victor J.), J. Submitted Division 1 February 9, 1967 at Detroit. (Docket No. 2,347.) Decided December 23, 1968. Rehearing denied February 14, 1969. Leave to appeal granted April 24, 1969. See 381 Mich 817.

Complaint by George L. Williams, and others similarly situated, against the Civil Service Commission of the city of Detroit, its members, and its secretary and chief examiner, in their official capacity, for an order of superintending control requiring defendants to reinstate plaintiffs as city employees. Judgment for defendants. Plaintiffs appeal. Reversed.

*Zwerdling, Miller, Klimist & Maurer,* for plaintiffs.

*Robert Reese,* Corporation Counsel, and *John R. McKinlay,* Assistant Corporation Counsel, for defendants.

*Amicus Curiae: Gilbert Donahue,* for Metropolitan Detroit Branch, American Civil Liberties Union of Michigan.

LEVIN, P. J. Plaintiffs are employees of the city of Detroit. They challenge the validity of rule VII promulgated by the city of Detroit civil service commission. The rules provides:

"All persons working in any branch of the City Civil Service shall reside in the city of Detroit."

The plaintiffs proceeded first by petition addressed to the commission. The commission held a hearing at which plaintiffs' attorney argued their position, but no evidence was offered in support of the claims that the rule is irrational and, therefore, beyond the competence of the commission to promulgate and violative of the State and Federal constitutions.

The commission denied plaintiffs' petition. Plaintiffs then filed a complaint with the circuit court. The circuit judge in a comprehensive opinion ruled that the city charter confers on the commission the power to promulgate rule VII and that it is not unconstitutional.

On this appeal, plaintiffs state 2 questions:

1. Did the Detroit civil service commission exceed its power under the city charter by promulgating a general residence requirement for municipal employees?

2. Does a rule conditioning municipal employment on the requirement that the employee reside within the city's boundaries violate constitutional guarantees of due process, equal protection and civil and political liberty?

As a general proposition courts will not reach a constitutional question if they can decide the case on nonconstitutional grounds, whether or not such grounds have been properly raised by the parties (see footnote 1). *Neese* v. *Southern Railway Company* (1955), 350 US 77 (76 S Ct 131, 100 L Ed 60); 16 Am Jur 2d, Constitutional Law, § 113, p 301. .

In *Alma Motor Co.* v. *Timken-Detroit Axle Co.* (1946), 329 US 129, 132 (67 S Ct 231, 91 L Ed 128), the United States Supreme Court reversed and sent that case back to the Circuit Court of Appeals for consideration of a nonconstitutional question which

was (p 132) "neither considered nor decided by the court below, nor argued here."

The court observed (pp 136, 137):

"If two questions are raised, one of non-constitutional and the other of constitutional nature, and a decision of the non-constitutional question would make unnecessary a decision of the constitutional question, the former will be decided. This same rule should guide the lower courts as well as this one."

And later (p 142):

"The principle of avoiding constitutional questions is one which was conceived out of considerations of sound judicial administration. It is a traditional policy of our courts."

Thus, we should not consider the constitutional questions plaintiffs ask us to resolve in their favor until it is determined that the case cannot be decided on nonconstitutional grounds.

Returning to question 1, did the commission exceed its power by promulgating a general residence requirement? For reasons hereafter stated we hold that the commission did exceed its powers when it established a residence requirement as a condition of *continuing* employment. We intimate no opinion as to the commission's power to adopt a *general* residence requirement as a condition of *initial* employment.[1]

---

[1] Under question 1 plaintiffs in their original brief argued that since the charter does not contain a *general* residence requirement and the commission is not by the charter expressly authorized to establish one, it was beyond the commission's power to establish such a requirement because in doing so the commission adds a condition to public employment. It was contended that such an added condition violates the charter provision that "all appointments * * * in the classified service of the city shall be made under and according to the provisions for civil service" (Title 4, ch 2, § 9), a general residence requirement not being one of those provisions.

The general statement of the commission's powers appears in Title 4, ch 2, § 7 of the charter.[2]

---

In reply the commission relied on its power under Title 4, ch 2, § 11 of the charter quoted in the main text of this opinion.

Plaintiffs responded that such specific uniform limitations as to each kind of work or occupation must "obviously, then, * * * be related to the needs of the job or occupation," and unless it is demonstrated that the residence requirement is so related it violates the charter provision that "all officers and employees of the city shall be selected with reference to their qualifications and fitness and the good of the public service, and without reference to their political faith or party affiliations" (Title 4, ch 1, § 2[e]), because, unless the residency requirement is so related, a consideration other than one based on "qualifications and fitness and the good of the public service" has been extraneously interjected.

Our disposition of this case makes it unnecessary for us to answer the question as posed by the plaintiffs. In light of our holding that the commission may not adopt a residence requirement as a condition of continuing employment, resolution of the question whether the commission may adopt a *general* residence requirement as a condition of initial employment is of no importance to the appellants, all of whom are presently employees of the city.

We asked for and received from counsel supplemental briefs on the specific question which we have today decided. See *Perin* v. *Peuler* (1964), 373 Mich 531, 534.

2 Section 7 reads:

"The powers and duties of the commission shall be as follows:

"(a) It shall classify all the offices and positions of employment with reference to the examinations herein provided for, excepting as herein otherwise provided;

"(b) Shall from time to time make, in accordance with the provisions hereof, rules adapted to carry out the purposes of this chapter and not inconsistent with its provisions for the examination and selection of persons to fill the offices and positions in the classified service, which are required to be filled by appointment and for the selection of persons to be employed in the service of the city;

"(c) Shall supervise the administration of the civil service rules, hold examinations thereunder from time to time, giving due notice thereof, prepare and keep an eligible list of persons passing such examinations and certify the names of persons thereon to appointing officers of the several departments;

"(d) Shall, by itself or otherwise, investigate the enforcement of the provisions of this chapter, of its own rules and of the action of appointees in the classified service. In the course of such investigation the commission or its authorized representative, shall have power to administer oaths, and the commission shall have power to secure by its subpoena both the attendance and testimony of witnesses and the production of books and papers relevant to such investigation;

"(e) Shall provide, through the purchasing department of the city, all needed supplies for the use of the commission; and

"(f) Shall have such other powers and perform such other duties as may be necessary to carry out the provisions hereof."

Section 11 provides for examinations:

"All applicants for offices or positions in said classified service, except those herein otherwise specified, shall pass an examination which shall be made public, competitive and free to all citizens of the United States, *with specific limitations as to residence,* age, health, habits and moral character, which shall be uniform as to each kind of work or occupation." (Emphasis supplied.)

That the commission in fact enforces rule VII against nonresidents appears from its annual reports:

"Residence is continuously policed and all known cases of individual evasions  *  *  *  are regularly processed and resolved by *this commission.*" 1961 Annual Report of the Detroit Civil Service Commission, Pt 1, p 12. (Emphasis supplied.)

In the 11-year period, 1956 through 1966, a total of 36 employees were discharged on grounds of nonresidence. Twenty-eight were discharged in the last 5 years of that period. 1956–1966 Annual Reports of the Detroit Civil Service Commission. The interim annual report for 1967 details by city department the residence investigations "by a civil service investigator."[3]

The commission's initiative in this area is beyond its authority, which is to (i) classify positions, (ii) hold examinations "with specific limitations as to residence"—the word "with" modifies the word "examination" and, thus, the phrase "with specific

[3] The 1967 interim annual report shows the following figures: Total investigation, 85; site investigation, 34; residence check, 51; bona fide residence established, 55; improper residence determined, 30; known non-residents, 7, "represents the number of known city employees as of December 31, 1967 residing in unauthorized areas, *in which specific commission action* has been taken"; pending investigations, 27; removed from payroll, 4. (Emphasis supplied.)

limitations as to residence" relates only to *examinations,* not tenure in employment, (iii) prepare an eligible list, (iv) certify names to the appointing authority, (v) disapprove discharge of provisional appointees, consent to transfer of provisional appointees, (vi) set aside promotions it finds were made for reasons other than the "interest of the service" and discharges, *etc.,* "made for political or for reasons other than the good of the service."[4]

The appointing authority, not the commission, decides when, if at all, to discharge an employee. rule VII, which seeks to impose a mandate on the appointing authority and to compel discharge for nonresidence, exceeds the power of the commission to promulgate or enforce.

In *Delaney* v. *Detroit Board of Fire Commissioners* (1928), 244 Mich 64, 66, a fire fighter was discharged by the fire department for "intoxication and

[4] Section 13 of Title 4, ch 2 provides for applications, which shall state various facts, including current residence and "business or employment and residence for the previous five years." Section 14 states that from the returns of the examination, an eligible list shall be prepared "in the order of their relative excellence as determined by examination without reference to priority or time of examination," and that the commission may restore certain resigned civil servants to the eligible list "when in the judgment of the commission it would be for the good of the service."

Section 15 states that the appointing authority shall appoint the candidate standing highest on the eligible list, which appointment shall be provisional. Unless the appointee is discharged prior to the end of the probation period, the appointment is deemed complete. "At or before the expiration of the period of probation, the head of the department or office in which a candidate is employed may, with the consent of said commission, based upon the written reasons submitted to it, discharge him, or the commission may transfer him to another department with the consent of such department."

Under § 16, the appointing officer "shall have control over all promotions," but must advise the commission of his reasons therefor. The commission may set a promotion aside if it concludes "the promotion was made for political or other considerations or reasons except the interest of the service."

Section 18 prohibits discharge, reduction in rank or suspension "for political or religious reasons." The commission may set aside any discharge, reduction or suspension that it finds "was made for political or for reasons other than the good of the service."

for the good of the service." The civil service commission ordered him reinstated. The Supreme Court reversed. It held that under § 18 the commission "is limited to the determination of two questions:

"(1) Was the employee discharged for political or religious reasons, or

"(2) Was he discharged for other reasons than the good of the service."

The Court held that the commission could not retry the issue of intoxication, that (p 67) the commission's "business is to see that the departmental heads act in good faith, not to correct their judgment":

"The board of fire commissioners has the power of appointment and the *power of removal* for any reason not prohibited by the charter. It alone is given jurisdiction to try the question of guilt or innocence or specific charges made against its employees. It is required to give the party charged a trial and to prescribe the punishment if he is found guilty. The charter does not say that he shall have two trials on the merits, one before the board of fire commissioners and the other before the civil service commission. The authority of the commission under the charter is to inquire into the motives or reasons for the discharge and not into the sufficiency of the evidence on which the trial board acted. The civil service commission is not concerned with the guilt or innocence of the employee, except as that fact aids it in determining if the removal was for some other unlawful purpose or reason. In other words, what it is authorized to inquire into is the good faith of departmental heads in removing their employees." *Delaney* v. *Detroit Board of Fire Commissioners, supra,* pp 66, 67. (Emphasis supplied.)

In *Slavin* v. *City of Detroit* (1933), 262 Mich 173, policemen and firemen who had been discharged as

an economy measure failed in their effort to compel the city to restore them:

". "While it is true that the council may indirectly control the number of officers and employees by limiting the appropriation, the right of appointment and *removal,* increase and decrease of the forces, still remains in the hands of the police commissioner and the board of fire commissioners respectively." *Slavin* v. *City of Detroit, supra,* pp 176, 177. (Emphasis supplied.)

Later in the opinion the Court stated:

"In coming to our conclusion, we have not been unmindful of the fact that appointments to the fire department force are regulated by civil-service provisions in the charter, which, however, do not affect dismissals made for reasons of economy. [Citations omitted.] As to the location of the power of appointment and removal of firemen, see *Delaney* v. *Detroit Board of Fire Commissioners,* 244 Mich 64." *Slavin* v. *City of Detroit, supra,* p 179.

See, also, *Philbrick* v. *Dust* (1914), 178 Mich 605, 607. *Cf. Kane* v. *City of Flint* (1955), 342 Mich 74, 79.

While § 7 (see footnote 2) confers upon the commission powers and duties *"necessary* to carry out the provisions hereof," and it may adopt rules "adapted to carry out the purposes of this chapter and not inconsistent with its provisions for the *examination and selection* of persons to fill the offices and positions in the classified service, which are required to be filled by appointment and *for the selection* of persons to be employed in the service of the city" the commission does not under the quoted words have powers or duties *not* necessary to carry out "the provisions hereof" or to promul-

gate rules unrelated to examination and selection of employees. (Emphasis supplied.)

Rule VII, establishing a general residence requirement as a *continuing* condition of employment, is not necessary to carry out duties and powers conferred on the commission. The rule goes well beyond establishing a provision related to examination and selection of employees.[5]

If the commission can establish any continuing condition of employment, then it may establish others. It appears, however, that many such conditions are established not by the commission, but by the legislative body, the common council, by ordinance. Provisions regarding hours of work and method of payment, including holidays, vacations, sick leave, and related matters are covered by ordinance. See chapter 16, Civil Service and Personnel Regulations, Municipal Code, City of Detroit. We note the recent passage of a general residence requirement by the common council (see footnote 8).

[5] For cases holding civil service rules invalid, see Annotation, Validity, Construction and Application of Probationary Provisions of Civil Service Statutes or Regulations (1941), 131 ALR 383, 388–390. See, also, 15 Am Jur 2d, Civil Service, § 8, p 470. In *Boyman* v. *Enright* (1924), 122 Misc 833 (204 NYS 57), the court held that the commission's duty ended upon certification of the employee and that it had no power to place conditions upon his obtaining a permanent appointment. See *Wheeler* v. *City of Santa Ana* (1947), 81 Cal App 2d 811 (185 P2d 373, 376, 377), holding invalid a long-standing civil service commission rule as beyond the capacity of the commission to promulgate.

In *Kennedy* v. *City of Newark* (1959), 29 NJ 178 (148 A2d 473, 478) the court held valid against constitutional attack a *city ordinance* requiring residence as a condition of continued employment. Plaintiffs also argued that since the legislature specified residence as a qualification for initial appointment or employment, it must follow that the legislature intended that continued residence shall not be required. The court suggested that since residence was initially required, one might imply that such condition must be maintained for continued employment. But the court there declined to decide that question, holding only that the eligibility requirement did not imply a legislative decision that residence may not be required for continued employment. Similarly, see *Gagliardi* v. *Ambridge Borough* (1960), 401 Pa 141 (163 A2d 418). *Cf. Mosebar* v. *Moore* (1952), 41 Wash 2d 216 (248 P2d 385, 387).

The Supreme Court has held:

"In the adoption of rules pursuant to charter authority the civil service commission is bound by the provisions creating it and defining its powers and duties. In the adoption of ordinances the council is likewise limited. *Mayor of City of Dearborn* v. *Dearborn Retirement Board* (1946), 315 Mich 18, 24. In the event of a conflict the requirements of the charter as adopted by the people of the municipality are controlling." *Brady* v. *City of Detroit* (1958), 353 Mich 243, 248.[6]

Since we have concluded that the charter of the city of Detroit does not allocate to Detroit's civil service commission the power to establish a residency requirement as a continuing condition of employment, it is not necessary for us to reach the attack on constitutional grounds made upon the rule by the appellants.

---

[6] The home rule act authorizes a home rule city's charter to provide "for a system of civil service." MCLA, § 117.4i(7), as amended by PA 1963, No 166 (Stat Ann 1968 Cum Supp § 5.2082). See, also, Const 1963, art 11, § 6, authorizing local governments to adopt merit systems. Since no guidelines are prescribed, there are great differences between the several home rule cities regarding the powers conferred on their civil service commissions. As to residency requirements, some municipalities have them, others do not. See Table A, p 96, 1967 Salaries, Wages, and Fringe Benefits in Michigan Municipalities over 4,000, Michigan Municipal League, Information Bulletin No 108 (February, 1967).

This disparity is recognized in § 10 of the Firemen and Policemen Civil Service Act (PA 1935, No 78; MCLA, § 38.501 *et seq.* [Stat Ann 1949 Rev § 5.3351 *et seq.*]) which requires residency, unless waived, as a precondition to employment, but "after his acceptance by the civil service commission, the applicant shall be governed as to residence by the provisions of any city or village *charter.*" MCLA, § 38.510(a), subdivision fourth. (Emphasis supplied.) The Firemen and Policemen Civil Service Act, the provisions of which are optional and not mandatory, has not been adopted by Detroit.

The powers of the Detroit Civil Service Commission are to be contrasted with those of the State Civil Service Commission, which is empowered to "regulate all conditions of employment in the classified service." Const 1963, art 11, § 5.

The corporation counsel expressly states that the mayoral and common council endorsement of the residency requirement in September, 1964, was not a delegation of authority to the civil service commission to promulgate rule VII.[7]

We decline appellants' invitation that we pass on the constitutionality, interpretation and effect upon them of the residency ordinance adopted in May, 1968, by the city of Detroit.[8] We prefer to have questions concerning that ordinance reach us after consideration by a trial judge in the new factual and legal context created by its passage.

Reversed. No costs, a public question.

R. B. BURNS and McGREGOR, JJ., concurred.

---

[7] When the plaintiffs petitioned the commission, the corporation counsel advised the commission to obtain an endorsement of rule VII from the mayor and common council. The mayor wrote the common council in September, 1964, stating, "I agree with the residence requirement and, therefore, approve the attached report of the Civil Service Commission." The report traced the history of the rule, which precedes the present charter; the rule originally required only that applicants have been residents for 1 year prior to examination. The rule took its present form in 1939, but was later the subject of further elaboration. In response to the mayor's communication, the common council, in September, 1964, adopted a *resolution* stating it "does hereby endorse the residence policies as set forth therein [the 1964 report of the commission above referred to]."

As to the power of the city to act by resolution compare *L. A. Thompson Scenic Railway Co.* v. *McCabe* (1920), 211 Mich 133, 138, with *Common Council of the City of Detroit* v. *Engel* (1919), 207 Mich 106, 127, and *Brozowski* v. *City of Detroit* (1957), 351 Mich 10, 16. See, also, *City of Detroit* v. *Detroit United Railway* (1921), 215 Mich 401, 410.

[8] On May 28, 1968, the mayor of Detroit approved an ordinance passed by the common council providing that "all police officers, appointees in the unclassified service * * * and all persons working in any branch of the classified service of the city shall reside in the City of Detroit." Municipal Code, City of Detroit, § 2–1–1.2, *et seq*. The ordinance became effective June 8, 1968.